```
 1              UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF ARIZONA

 3

 4   Conrad Mitchell,
         Plaintiff,              Case No. 4:22-CV-00435-JAS
 5

 6   vs.

 7   JPMorgan Chase Bank, N.A.,
         Defendant.
 8

 9   DEPONENT:      KRYSTAL SPAULDING
     DATE:          Tuesday, Aril 30, 2024
10   TIME:          1:02 p.m.
     LOCATION:      Livonia, Michigan
11                  Via Zoom

12   APPEARANCES:

13   For the Plaintiff:    CY T. HAINEY ESQUIRE
                           Hilltop Law Firm
14                         P.O. Box 9096
                           Phoenix, Arizona 850068
15                         (602) 466-9631

16                         GARY NITZKIN ESQUIRE
                           Gary D. Nitzkin, PC
17                         39111 6 Mile Road, Suite 142
                           Livonia, Michigan 48152
18                         (248) 353-2882

19   For the Defendant:    SARAH NOE ESQUIRE
                           Bullard Spahr
20                         1 East Washington, Suite 2300
                           Phoenix, Arizona 85004
21                         (602) 798-5486

22   REPORTED BY:          JENNIFER CLAUSON, CSR-6867
                           Esquire Deposition Solutions
23                         (844) 730-4066

24

25
```



1            MS. NOE:  Objection, form and foundation, you
2    can answer.
3         A.   Yes.
4    BY MR. HAINEY:
5         Q.   And can you tell us why it's labeled as that?
6         A.   Because our system recognized the transaction
7    is possibly high risk.
8         Q.   And this text message relates to Mr.
9    Mitchell's credit card ending in 5573, does it not?
10        A.   Yes.
11        Q.   Okay.  And just to back up, you mentioned that
12   the -- your system had identified this transaction as
13   high risk?
14        A.   As possible high risk.
15        Q.   Okay.  Can you tell us why it categorize the
16   transaction as that?
17        A.   It could be a number of reasons.  It can be
18   the spending pattern, the dollar amount.  I don't have
19   the exact reason why it was flagged as potential high
20   risk.
21        Q.   But it's safe to say if this message was
22   generated, then there was some risk, some degree of
23   risk detected?
24        A.   Correct.
25        Q.   So, before today, have you seen this text



```
 1   Mitchell received from Chase on August 12th, 2023,
 2   related to a charge on his account to SeaWorld of San
 3   Diego for $1,756.23.  Does that seem to be correct?
 4        A.   Correct.
 5             MS. NOE:  Objection, form and foundation, but
 6   yes, you can answer.
 7   BY MR. HAINEY:
 8        Q.   And this relates to Mr. Mitchell's credit card
 9   ending in 5573, does it not?
10        A.   Yes.
11        Q.   Have you seen this document before?
12        A.   Yes.
13        Q.   All right.  And this message also is labeled
14   as Chase fraud alert, right?
15        A.   Yes.
16        Q.   And again, why -- why would this be labeled as
17   a Chase fraud alert?
18        A.   We deemed it as a high risk, possible high
19   risk transaction.
20        Q.   Okay.  And this message also says decline
21   transactions, does it not?
22        A.   Correct.
23        Q.   And did this -- did this message require Mr.
24   Mitchell to do anything if he did not authorize the
25   charge?
```



1   called in, and we know someone called in, you know, we
2   will review that call to see -- know who was calling
3   in and likely what security they passed and things
4   like that.  So case-by-case.
5       Q.  And did you listen to the recordings in this
6   case?
7       A.  Yes.
8       Q.  So, when Chase investigates credit card
9   disputes, then they would review these recordings?
10          MS. NOE:  Objection, form, you can answer,
11  Sarah.
12      A.  Oh, not -- not all the time.
13  BY MR. HAINEY:
14      Q.  And so do you know if Chase has reviewed the
15  recordings in this case in the course of investigating
16  Mr. Mitchell's disputes to the charges --
17      A.  No.
18      Q.  -- in this case?
19      A.  No.
20      Q.  They haven't reviewed the recordings?
21      A.  For the law --
22          MS. NOE:  Objection, you can answer.
23      A.  For the lawsuit, yes.  For the initial fraud
24  review, no.
25  BY MR. HAINEY:



```
 1            MR. HAINEY:  Yeah.
 2       A.   Okay.  Because I have two calls on here from
 3   the same day, but I don't know which one is first.
 4   BY MR. HAINEY:
 5       Q.   Well, the first one we're wanting to do is the
 6   one from 9:33 a.m.
 7       A.   Okay.
 8            (Played video recording on the record)
 9   BY MR. HAINEY:
10       Q.   Okay.  So in our -- so this -- in the
11   recording here that was Mr. Mitchell, in the
12   recording, did you hear the Chase operator ask for any
13   identification from the caller to verify that this was
14   Mr. Mitchell?
15            MS. NOE:  Objection, form, foundation, you can
16   answer.
17       A.   No.
18   BY MR. HAINEY:
19       Q.   And in the recording, the caller complained
20   that Chase had a declined charge to his card to Trip
21   Advisor, right?
22       A.   Yes.
23       Q.   Chase also declined his charge to SeaWorld,
24   right?
25       A.   Yes.
```



```
 1        Q.  But, you know, would you agree with me that
 2   Chase was suspicious of these transactions?
 3            MS. NOE:  Objection, foundation -- sorry.
 4   Form, and you can answer.
 5        A.  Yes.
 6   BY MR. HAINEY:
 7        Q.  Okay.  Just stay within here.  In that
 8   recording, did the caller complain about receiving any
 9   e-mails declining the charges?
10        A.  No.
11        Q.  All right.  So, there's another recording that
12   we're going to play for you.
13            (Played video recording on the record)
14   BY MR. HAINEY:
15        Q.  Okay.  Krystal, so this call was also made on
16   August 12th, 2022 at eight -- sorry, but at 9:53 a.m.
17   And this is about 20 minutes after the last call,
18   right?
19        A.  Yes.
20        Q.  And this was the second call that the
21   fraudster made that day, right?
22            MS. NOE:  Objection, form, foundation, you can
23   answer.
24        A.  That was the second call.  I don't know if it
25   was a fraudster.
```



1  BY MR. HAINEY:
2       Q.  In this recording, I heard Chase ask for the
3  plaintiff's mother's maiden name.  Did you also hear
4  that?
5       A.  Yes.
6       Q.  And I heard the fraudster respond with Linton
7  the first time.  Did you also hear that?
8       A.  Yes.
9       Q.  But that answer was rejected by Chase, right?
10      A.  Yes.
11      Q.  The fraudster then guessed Linderman as if he
12  was asking a question.  Did it sound like that to you?
13      A.  No.
14      Q.  Did you hear the caller guess the maiden name
15  is Linderman?
16      A.  Yes.
17      Q.  Okay.  And that answer was also rejected by
18  Chase, correct?
19      A.  Yes.
20      Q.  And then finally, he guessed Lindman, right?
21      A.  Yes.
22      Q.  And that answer was also rejected by Chase,
23  correct?
24      A.  Yes.
25      Q.  Chase didn't seem to find it suspicious that



```
 1   the caller didn't know his own mother's maiden name
 2   and then started to asking him another security
 3   question when the recording broke off.  Why do you
 4   think the recording broke off?
 5           MS. NOE:  Objection --
 6       A.  I don't know.
 7           MS. NOE:  -- you can answer.
 8       A.  I don't know.
 9   BY MR. HAINEY:
10       Q.  Is there another recording that Chase has that
11   is a complete recording of the conversation?
12       A.  I don't know.
13       Q.  Do you find it suspicious that a card user
14   would not know his own mother's maiden name?
15       A.  No.
16       Q.  Just to clarify, would you find it suspicious
17   that a person wouldn't know his mom's maiden name?
18           MS. NOE:  Objection, form, asked and answered,
19   you can answer.
20       A.  No.
21   BY MR. HAINEY:
22       Q.  Okay.  Okay.  So, then we have another
23   recording to play here.  This is another voice
24   recording that I received from Chase.  This was also
25   made on August 12th, 2022 at 10 a.m.  This was the
```



1  third call that Chase received on that account that
2  morning.
3           (Played video recording on the record)
4  BY MR. HAINEY:
5     Q.   Okay.  Krystal, thanks for listening to that.
6  I know that's kind of long.
7           In this recording that we just listened to, I
8  heard a voice that was different than the first two.
9  Did you hear that same thing?
10          MS. NOE:  Objection, form and foundation.  And
11 I'd also like to specifically object that Ms.
12 Spaulding is not an expert in voice recognition and
13 it's inappropriate to ask for her opinion on the
14 identity of the various callers.
15          With that objection noted, Krystal, you can
16 answer the question if you can.
17    A.   I'm not an expert on voice recognition.  So, I
18 couldn't definitely say.
19 BY MR. HAINEY:
20    Q.   I guess, let me rephrase the question here.
21 In your opinion, did the voice in this recording sound
22 different than the other two, just in your opinion as
23 a layperson?
24    A.   Yes.
25    Q.   Okay.  And this caller called in complaining



```
 1  that someone was making fraudulent charges on his
 2  account, right?
 3       A.   Yes.
 4       Q.   And in the call, Chase sent him a security
 5  code to his cell phone, right?
 6       A.   Yes.
 7       Q.   And he -- he identified SeaWorld, Legoland,
 8  and Trip Advisors bogus charges, correct?
 9       A.   Yes.
10       Q.   And these charges were verified in a call with
11  the former caller, which was the same morning at 9:33
12  a.m., right?
13            MS. NOE:  Objection, form, you can answer if
14  you can.
15       A.   Yes.
16  BY MR. HAINEY:
17       Q.   Mr. Mitchell said that he turned off the card
18  here, did he not?
19       A.   Yes.
20       Q.   Chase asked Mr. Mitchell did you call earlier
21  and verify the transaction and Mitchell said no,
22  correct?
23       A.   Correct.
24       Q.   Mr. Mitchell said that this was the first time
25  that he had called Chase, correct?
```



```
 1      A.   Correct.
 2      Q.   And Chase said someone else had called and
 3  verified the transaction from SeaWorld and failed the
 4  security verification, correct?
 5      A.   Correct.
 6      Q.   In the call, the Chase operator said that she
 7  believed someone else was attempting to access
 8  Mitchell's account, did she not?
 9      A.   Yes.
10      Q.   In this conversation, Chase told him to
11  destroy his card and they would send him a new one,
12  correct?
13      A.   Yes.
14      Q.   Mitchell also verified his mailing address,
15  did he not?
16      A.   Yes.
17      Q.   And Mitchell also verified his e-mail, didn't
18  he?
19      A.   Yes.
20      Q.   And that was the same e-mail address that
21  Chase had on file, correct?
22      A.   Yes.
23      Q.   Chase said that the charges would be credited
24  to his account, right?
25      A.   Yes.
```



```
 1   here, can you confirm that in this letter here, Chase
 2   has declined to give Mr. Mitchell credit for both the
 3   Viator and SeaWorld disputes, correct?
 4        A.   Correct.
 5        Q.   And the reason that Chase gives -- the reason
 6   that Chase declined these disputes was that Chase
 7   believed that Mitchell received benefit from each of
 8   the transactions, correct?
 9        A.   Correct.
10        Q.   Does this mean that Mr. Mitchell used the
11   tickets that were purchased with his credit card?
12        A.   No.
13        Q.   How did Chase arrive at the conclusion that
14   Mr. Mitchell received benefit from the Viator tickets?
15        A.   We received documentation from the merchant
16   that linked the tran -- the purchase to the customer.
17        Q.   And what information?  What was that?
18        A.   We -- it had his name, billing address, and
19   e-mail address as well.  And charges were brought
20   print at home tickets.
21        Q.   Okay.  And what about that information led
22   Chase to believe that he had received benefit from the
23   purchases?
24        A.   Because they were for services to be provided
25   from the merchant.  And also the charges were verified
```



 1  valid through our voice -- through our voice
 2  recognition unit.  There was an inbound call from his
 3  phone number that validated these charges as well.
 4       Q.  And was that one of the three calls that we
 5  had just listened to?
 6       A.  No, it's not a call.  It's not -- it's not --
 7  when you speak to someone it's where you can call in
 8  and validate the charges without speaking to someone.
 9  So our systems captured that that we received an
10  inbound call from his phone number that validated
11  these charges.
12       Q.  And so you don't --
13       A.  August 12th.
14       Q.  Okay.  And so Chase doesn't have any
15  recordings of Mr. Mitchell verifying these
16  transactions?
17       A.  No.
18       Q.  And then, you know, and as we heard, you also
19  received a call from Mr. Mitchell stating that these
20  were not his charges, right?
21       A.  Correct.
22       Q.  But let's see here.  But Chase -- so
23  evidently, Chase trusted the automated sister --
24  automated system over Mr. Mitchell himself?
25            MS. NOE:  Objection, form, you can answer.



1    A.  Yes.  We captured that the call was coming in
2    from his phone number.
3    BY MR. HAINEY:
4        Q.  Phone numbers can be spoofed, right?
5            MS. NOE:  Objection, foundation.
6        A.  Yes.
7    BY MR. HAINEY:
8        Q.  And so because of that, then someone else
9    could have called in and it would have shown up as Mr.
10   Mitchell's phone number?
11       A.  Yes.
12       Q.  And so the automated system isn't perfect,
13   right?  It's not infallible?
14       A.  No, it's not.
15       Q.  Okay.  So, we've got another document that
16   we're going to show you here.  This will be our
17   Exhibit No. 7.
18           So, these are documents that we've received
19   from Chase in this case that appear to have come from
20   Viator.  I believe, that these are in response to a
21   subpoena.  Have you seen these documents before?
22           MS. NOE:  Objection.  Just to be clear, for
23   the record, you're correct.  These are documents that
24   were produced in response to the subpoena.  This topic
25   was not noticed for deposition today.  So, you may ask



```
 1   address.  Are you aware that that -- let me show it
 2   here.  Sorry.  So back to Exhibit 7 here, the IP
 3   address.  Are you aware that this is not or never has
 4   been Mr. Mitchell's IP address?
 5        A.  No.
 6        Q.  And does Chase still believe that Viator had
 7   proof that the IP address is from Sacramento,
 8   California, that it was traceable to Mr. Mitchell?
 9            MS. NOE:  Objection to form, you can answer.
10        A.  No.
11   BY MR. HAINEY:
12        Q.  Do you believe that Viator had proof that the
13   IP address from Sacramento, California was traceable
14   to Mr. Mitchell?
15            MS. NOE:  Objection, foundation, you can
16   answer.
17        A.  No.
18   BY MR. HAINEY:
19        Q.  Would you agree with me that Chase never
20   reached out to Mr. Mitchell to discuss his whereabouts
21   on August 12th, 2022 as part of this investigation?
22        A.  Yes.
23        Q.  Okay.  I'm going to show you Exhibit No. 9
24   here.  So, this is SeaWorld's response to Chase's
25   subpoena.  Have you seen these documents before?
```



```
 1        Q.  But you can see in this document here where it
 2   indicates that this IP address is from Los Angeles?
 3            MS. NOE:  Objection, form, foundation, you can
 4   answer.
 5        A.  Yes.
 6        Q.  Are you aware that this IP address belongs to
 7   AT&T?
 8            MS. NOE:  Objection, foundation, you can
 9   answer.
10        A.  Yeah.
11   BY MR. HAINEY:
12        Q.  Okay.  Are you aware that Mr. Mitchell's cell
13   phone is and always has been on Verizon?
14            MS. NOE:  Objection, foundation, you can
15   answer.
16        A.  No.
17   BY MR. HAINEY:
18        Q.  Are you aware that this IP address is not and
19   never has been that of Mr. Mitchell?
20            MS. NOE:  Objection, foundation, you can
21   answer.
22        A.  No.
23   BY MR. HAINEY:
24        Q.  So based on all this, how did Chase arrive at
25   the conclusion that Mr. Mitchell received benefits
```

```
 1   from the SeaWorld tickets?
 2         A.  Based off the merchant documents, we were
 3   provided with his name, e-mail address, billing
 4   address, and we received an inbound call to our voice
 5   response unit validating the charge.
 6         Q.  So, I just want to talk about reinvestigation
 7   now.  So, what investigation did Chase perform in
 8   response to Mr. Mitchell's dispute as to the three
 9   credit card charges?
10         A.  So, what we did is we sent the charges back to
11   the merchant.  It's called a dispute or a charge back
12   that the customer was disputing the charges as
13   unauthorized.  And at that time, the merchant can send
14   us documents supporting that the charges is, in fact,
15   valid.  And we get those responses back from the
16   merchant through Visa.
17         Q.  Had Mr. Mitchell ever disputed anything on
18   this account before?
19         A.  I don't know.
20         Q.  Did Chase ever contact Mr. Mitchell in
21   connection with its investigation into these disputes?
22         A.  No.
23         Q.  Would that have been part of their
24   investigation to look at whether he had ever disputed
25   anything before?
```



1      A.   We -- they provided us with the information
2  with the customer's name, billing information, and
3  e-mail address that matches the customer as who
4  purchased the tickets.
5      Q.   And so from that information that it received,
6  what led Chase to believe that Mr. Mitchell did, in
7  fact, incur the charges with Trip Advisor?
8      A.   Correct.
9      Q.   I mean, sorry.  Let me rephrase the question.
10 What I meant to say was from the information that
11 Chase got from Trip Advisor through Visa, what in that
12 information led them to believe that Mr. Mitchell
13 actually incurred these charges with Trip Advisor?
14     A.   Name match, billing, and e-mail match for the
15 Trip Advisor charges.
16     Q.   And so did Chase also contact SeaWorld in the
17 connection -- in connection with its investigation in
18 a similar way to Trip Advisor?
19     A.   Yes, electronically through Visa.
20     Q.   Okay.  And so did it learn the same things as
21 it did in the investigation with Trip Advisor?
22     A.   Yes.
23     Q.   Okay.  Would -- would an identity thief have
24 the same information.
25          MS. NOE:  Objection, form, foundation, you can



```
 1   answer.
 2         A.   Yes.
 3   BY MR. HAINEY:
 4         Q.   Okay.  And so how does Chase know if Mr.
 5   Mitchell made these charges or if it was an identity
 6   thief?
 7         A.   We wouldn't.
 8         Q.   Okay.  Okay.  So, we're going to go back to
 9   Exhibit 1.  And what we're looking at is the Chase
10   counter bates number 102.  Sorry, I guess, I'm having
11   a little trouble here.
12              MR. HAINEY:  Sarah, I think I'm just having a
13   couple issues here.  I was wondering if maybe this
14   might be a good place to take a break?
15              MS. NOE:  Sure.  Sure.  How much time do you
16   need?
17   BY MR. HAINEY:
18         Q.   Okay.  You know, how are you doing there,
19   Krystal?  Do you want like a 10-minute break or so?
20         A.   Yeah, that's fine.
21         Q.   Is that good?  Okay, just 10 minutes then.
22              MS. NOE:  Okay, thanks.
23              MR. HAINEY:  Thanks.
24              (Off the record 2:29 p.m.)
25              (Back on the record 2:40 p.m.)
```

